James Christopher Wehrle, #45592MO
**WEHRLE LAW LLC**
2601 S. Hanley Rd.
St. Louis, Missouri 63144
(314) 272-4113
(314) 272-4107 Facsimile
chris@wehrlelaw.com

*Liaison Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| KEVIN MCGEACHY, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> PEABODY ENERGY CORPORATION, JAMES C. GRECH, MARK A. SPURBECK and MARC E. HATHHORN, <br><br> Defendants. | Case No. <br><br> **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> **CLASS ACTION** <br><br> <u>Demand for Jury Trial</u> |

Plaintiff Kevin McGeachy ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Peabody Energy Corporation ("Peabody Energy" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Peabody Energy's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities

analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

**NATURE OF THE ACTION**

1. This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Peabody Energy common stock between October 14, 2024 to May 4, 2026, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2. Defendants provided investors with material information concerning Peabody Energy's expected longwall production rates at its Centurion mine for fiscal year 2026. Defendants' statements included, among other things, confidence and repeated statements assuring investors of the Company's ability to fully ramp-up Centurion by March 2026.

3. Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts concerning the true state of Peabody Energy's Centurion mine and the multitude of issues causing delays to the ramp-up and the return to full longwall production dates. Such statements absent these material facts caused Plaintiff and other shareholders to purchase Peabody Energy's securities at artificially inflated prices.

4. Investors began to question the veracity of Defendants' public statements on March 30, 2026, when Peabody Energy issued a press release lowering guidance pertaining to Centurion

2

mine's expected first quarter 2026 output ahead of the Company's full earnings release. In pertinent part, Defendants announced that sales volume from the Centurion mine was expected to deliver approximately 250,000 tons in the first quarter due to mining commissioning challenges (compared to previous estimates of around 700,000 tons).

5.      Investors and analysts reacted immediately to Peabody Energy's revelation. The price of Peabody Energy's common stock declined dramatically. From a closing market price of $39.50 per share on March 27, 2026, Peabody Energy's stock price fell to $35.68 per share on March 30, 2026, a decline of about 9.7% in the span of a single trading day.

6.      Notwithstanding the March 30 disclosures, Peabody Energy continued to mislead investors. Defendants failed to present information related to the Centurion mine's "challenges," including the scope of the issues or the significant cost and delays these issues would cause. Instead, Peabody Energy simply stated the mine was facing challenges, providing no further details.

7.      The full truth finally emerged on May 5, 2026, when Peabody Energy issued a press release disclosing the Company's failure to ramp-up Centurion by the long-awaited March 2026 deadline and cutting guidance related to full year met segment volumes to reflect the increased cost and substantial volume decrease.

8.      Investors and analysts reacted immediately to Peabody Energy's revelation. The price of Peabody Energy's common stock declined dramatically. From a closing market price of $26.52 per share on May 4, 2026, Peabody Energy's stock price fell to $25.00 per share on May 5, 2025, a decline of 5.7%.

## JURISDICTION AND VENUE

9.     Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

10.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

12.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as a significant portion of its business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

13.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

14.     Plaintiff purchased Peabody Energy common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing his transaction(s) in Peabody Energy is attached hereto.

15.     Peabody Energy Corporation is Delaware corporation with its principal executive offices located at 701 Market Street, St. Louis, Missouri 63101-1826. During the Class Period, the Company's common stock traded on the New York Stock Exchange (the "NYSE") under the symbol "BTU."

16. Defendant James C. Grech ("Grech") was, at all relevant times, the President, Chief Executive Officer, and Director of Peabody Energy.

17. Defendant Mark A. Spurbeck ("Spurbeck") was, at all relevant times, the Executive VP and Chief Financial Officer of Peabody Energy.

18. Defendant Marc E. Hathhorn ("Hathhorn") was, from the start of the Class Period until October 31, 2024, the President of Global Operations at Peabody Energy.

19. Defendants Grech, Spurbeck, and Hathhorn are sometimes referred to herein as the "Individual Defendants." Peabody Energy together with the Individual Defendants are referred to herein as the "Defendants."

20. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Peabody Energy's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

21. Peabody Energy is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all

5

the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

22.    The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Peabody Energy under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### *Company Background*

23.    Peabody Energy describes itself as a leading producer of metallurgic and thermal coat. The Company owns interests in 16 active coal mining operations in the United States and Australia.

### *The Defendants Materially Misled Investors Concerning Peabody Energy's*
### *Centurion Mine Development and Fiscal Year 2026 Segment Guidance*
### *October 14, 2024*

24.    On October 14, 2024, Peabody Energy hosted a Special Call disclosing the developments and plan for Centurion. Defendant Hathhorn stated, in relevant part:

> Thus far in the second half, we processed our first development coal through the preparation plant and expect the first coal shipment by the end of the quarter. We also expect to commission our third continuous miner in coming weeks to further accelerate our development activities. ***We continue to advance on time and on budget towards full-scale long-haul production in March 2026.***
>
> At Peabody, we strive for safety and excellence in every aspect of our operations. and this is driven by the world-class team we've assembled at Centurion. Centurion's General Manager and our VP of Australia Underground operations, each have over 25 years of underground mining and major project development experience, bringing a wealth of knowledge and expertise to Centurion. Having the right management team and support team is the difference maker.
>
> As we ramp up to full-scale longwall production, we continue to onboard operators and maintenance personnel to support underground development in preparation for longwall mining. With the new exciting world-class project like Centurion, the buzz

6

in the region and targeted recruitment have allowed for all key positions to be filled and we continue to hire experienced miners to continue our development work ahead of schedule.

All required licenses and permits are in place for our longwall start in Centurion South District. Coal mining from Centurion North is approved by existing mining leases but will require an amendment to the existing environmental permit. These amendments are fairly routine exercise for our activities. We don't see any problems for that amendment.

Centurion has a large reserve of premier hard coking coal with approximately 140 million tonnes and a long mine life of over 25 years. With a coal seam in excess of 4 meters, the GM Seam is known for its geological stability, providing a consistent and continuous coal face that minimizes operational disruptions. The uniformity of the scene, combined with the state-of-the-art, fit-for-purpose longwall reduces the risks of operational variability. All of this allows for efficient mining and first quartile production costs.

\* \* \*

***The continuous miner cuts and bolts if it's a minor bulk arrangement. It cuts in both simultaneously increasing productivity and safety for the operators. Centurion has one set of Caterpillar longwall mining equipment, which is currently being stored on the surface in that picture I referenced. Following the development of southern panels, the longwall will be transported underground and installed to commence production, as I stated before, in March of 2026.***

[Emphasis added].

25.     Also during the Special Call, Defendant Spurbeck highlighted the March 2026 production date, in pertinent part:

As Mark mentioned, early underground development rates are ahead of schedule, and I'm pleased to say that capital costs remain on budget. As a reminder, Centurion benefits from $1 billion of existing infrastructure, resulting in comparably lower development capital for nearly 5 million tonne a year mine with 25-plus years of life. Consistent with our long-time estimate, we expect $489 million of capital investment to refurbish existing infrastructure and develop the southern panels ahead of longwall production in March 2026, of which $250 million has been spent to date.

We expect $430 million of incremental development capital to reach the 120 million tonnes of reserves in the northern panels and begin longwall production.

From a timing perspective, $130 million of that will be spent concurrent with the development of the southern panels, leaving approximately $300 million of remaining development capital over the initial 3 years of longwall mining in the South. After commencing longwall production in the North in 2029, annual sustaining capital is expected to be $60 million for the next 10 years.

26.     During the question-and-answer segment of the Special Call, Defendant Hathhorn answered questions pertaining to Centurion, in relevant part:

<Q: Karla Kimrey – Peabody Energy – VP of Investor Relations> Thank you. Mr. Hathhorn, I have a question for you, do you foresee any execution risk to get to the longwall operations in 2026.

<A: Marc E. Hathhorn> So it's coal mining there. Obviously, there's risk, but I feel good. And I feel good because we talked about it in the comments, equipment delivery can be risk, but we bought -- have that behind us and I say that because the third continuous miner unit is really close to showing up to site. And the fourth one is in sight. So that's becoming less of a risk to us getting all this development done and getting longwall going on March '26. So I feel good.

I think one of the luxury when I talk about new equipment generically but being more specifically is we've got a brand-new conveyance system. And we've got diversification with multiple continuous miners. If there is some maintenance downtime on one times we can make it up. When the belt is down, if the belt is down, we don't have good availability there, that can be an issue for a coal mine, but brand new belt, state-of-the-art, it's performing well. And still pretty good.

And I think we've got a solid team. We already went through a few areas, conditions wise, but the team didn't miss a beat in the safety of our people and more importantly, getting through it. So again, I feel very confident that -- and most partly by just the rates we're getting. We have some late equipment deliveries. The team is already making that up. Somebody say already made it up. And I just we're getting -- they're doing well. So I feel very confident that March 2026, will have the longwall getting.

*July 31, 2025*

27.     On July 31, 2025, Peabody Energy hosted a second quarter 2025 earnings call. As part of the call, Defendant Grech stated, in pertinent part:

Also of note, today, we announced an acceleration of longwall operations at our flagship premium hard coking coal mine, Centurion. We're now targeting longwall start-up in February 2026. This improved time line reflects strong execution across our operations team. By way of progress, we plan to start installing longwall shields

8

in November. Workforce expansion remains a key focus, and we already have approximately 260 employees hired. Through an active recruitment process, we aim to reach a head count of around 400 by early 2026 to support full production. I'd be remiss if I didn't also speak of the strong tailwinds in the U.S. markets. Last quarter, the President signed executive orders to revitalize the U.S. coal industry and expand the use of coal fuel generation. And earlier this month, the One Big Beautiful Bill was passed. It delivers long overdue relief to American coal producers by reducing royalty burdens, streamlining permitting and restoring regulatory certainty, enabling the industry to compete, invest and power the nation with confidence.

*October 30, 2025*

28.     On October 30, 2025, Peabody Energy hosted a third quarter 2025 earnings call.

As part of the call, Defendant Grech stated, in relevant part:

Our third quarter was punctuated by strong thermal coal shipments and historically low met coal costs. Also, I'm delighted to say that the longwall production at our flagship Centurion mine begins next quarter.

We expect shipments of Centurion's premium hard coking coal to expand sevenfold in 2026 to 3.5 million tons and even more beyond that time.

Development and hiring remains on track and longwall equipment is beginning to be installed underground ahead of the February start.

Over the 25-plus year mine life, we expect Centurion to be our lowest cost metallurgical coal mine. And by itself, the mine should boost our average met coal portfolio realizations as a percent of benchmark from the 70% mark this year to roughly 80% in 2026.

*February 5, 2026*

29.     On February 5, 2026, Peabody Energy hosted a fourth quarter and full year 2025

earnings call. As part of the call, Defendant Grech stated, in pertinent part:

***I'm pleased to announce that I was in Australia last week, where the team was installing the very last shield and putting the finishing touches on the Centurion mine in advance of starting longwall mining, well ahead of its original schedule.*** I have to say the culture that has been built at Centurion is outstanding, and our team has charged up and has started mining some of the best metallurgical coal in the world.

9

Let me remind you of some of the extensive benefits Centurion has on the Peabody portfolio. First, Centurion is expected to ship an average of 4.7 million tons per year of premium hard coking coal in a world that we remain convinced is structurally short of that product over time. We expect the mine to deliver 3.5 million tons in 2026, ramping up to that 4.7 million mark by 2028.

Second, Centurion's product is of the highest quality and coupled with proximity to key demand nodes in Asia, results in full benchmark pricing. Our realizations across our entire met coal segment are expected to increase from 70% of the recognized benchmark in 2025 to 80% this year. And as volumes ramp up to 4.7 million tons, we expect it will further exceed that 80%.

Third, this mine is a long-lived asset. Combined with the Wards Well acquisition in 2024 that allows significant development to the north, Centurion accesses the coveted Goonyella Middle Seam and is expected to have a mine life of 25-plus years with an integrated mine plan of 140 million tonnes. Finally, we previously reported a net present value for the project of $1.6 billion with all-in cost of $105 per short ton in [ 2024 dollars ] at an average benchmark price of $210 per metric ton, a level we are already above today.

Our latest assessment is that Centurion alone represents an NPV of $2.1 billion at $225 benchmark pricing. So top realizations with full benchmark pricing, low cost and a long mine life. Centurion is truly the cornerstone asset in our strategy to maximize long-term shareholder value and to intentionally reweight our portfolio toward higher-margin metallurgical coal. This event marks the culmination of years of disciplined strategic investment and have positions Centurion to deliver the scale, cost performance and premium product quality needed to meet the growing global demand for high-grade steelmaking coal.

Also during the quarter, we continued to make good progress in our asset optimization activities. Here, our goal is straightforward. Our Peabody development division is tasked with evaluating our vast land and mineral holdings to maximize our long-term earnings and cash flow potential from these assets. Actions include our work to locate renewable projects and formerly mined lands, notably in the United States with R3 Renewables. We're also working on Australia at the Centurion mine, developing a gas power station to convert waste gas to electricity, starting at 5 megawatts and expanding to 20 megawatts.

30.    Also during the earnings call, Defendant Spurbeck stated, in relevant part:

Peabody ended the year with $575 million in cash and total liquidity above $900 million, reflecting disciplined capital deployment through the period of intense development at Centurion and consistent cash generation despite lower than mid-cycle seaborne coal prices. We ended 2025 with another quarter of strong execution. For the full year, results met or exceeded original guidance for 7 of 8

10

volume and cost metrics. Seaborne thermal delivered 3.3 million tons, exceeding expectations. Realized export pricing averaged $81.80 per ton, up 7% from the third quarter. Costs came in below the low end of guidance and 12% lower quarter-over-quarter, supporting a robust 31% adjusted EBITDA margin and $63.5 million of fourth quarter EBITDA.

For the full year, the segment reported $222 million of adjusted EBITDA and total capital requirements were a mere $40 million. Costs were down over $3 per ton year-over-year, driven by disciplined cost management and higher production at the Wambo open cut. Seaborne met shipped 2.5 million tons, up $400,000 from the third quarter and above the fourth quarter target. Realized pricing began to improve and costs at $113 per ton were consistent with expectations. The segment delivered $24.6 million of adjusted EBITDA in Q4.

For the year, the segment generated $56 million of adjusted EBITDA. Shipments increased 1.3 million tons year-over-year to $8.6 million, but better yet, full year costs beat original guidance by more than $10 per ton. Peabody's Met segment will be further meaningfully improved with the start-up of Centurion, increasing volume to 10.8 million tons in 2026 and increasing segment-wide price realizations 10% versus the premium hard coking coal index. The U.S. thermal platform contributed $63 million of adjusted EBITDA in the fourth quarter. For the full year, the segment generated nearly $250 million of adjusted EBITDA against only $57 million of CapEx, demonstrating the consistent free cash flow generation capability of our reliable, low-cost U.S. thermal portfolio.

*    *    *

Looking ahead to 2026, I'll briefly review guidance for the full year. Seaborne thermal volumes are expected to be lower than 2025 due to the closure of the Wambo underground mine in Q3 last year and lower production at Wilpinjong due to reduced operating phases as the mine progresses into narrowing pits ahead of the Pit 9 and 10 extensions. Shipments are targeted at 12.5 million tons, including 8 million export tons. Costs are projected to be above 2025 levels at $50 per tonne on lower production. We anticipate a quality mix of 45% Newcastle and 55% higher ash product. Seaborne met volumes are projected to increase over 2 million tonnes to 10.8 million with the start of longwall production at Centurion. At the CMJV complex, we expect production to increasingly transition to the Coppabella mine as it completes the additional bench of pre-strip to improve high-wall stability in the third quarter of 2026 and Moorvale depletes its reserves.

Met coal costs are targeted at $113 per tonne, about $1 lower than last year. And we anticipate segment-wide average price realizations increasing to 80% of the premium hard coking coal index. For U.S. thermal, we expect a very similar year to 2025. In the PRB, we expect shipments between 82 million and 88 million tons and have 78 million tons priced at $13.40. Costs are expected to be consistent with 2025 levels at $11.50 per ton. Other U.S. thermal volumes are expected to be 13.7

million tons. We have 13.2 million tons priced at $54.40 and expect costs of $47 per ton, also in line with or better than 2025 results.

Total capital expenditures are estimated at $340 million, $70 million lower than 2025 as Centurion begins longwall production. As we reflect on 2025, Peabody delivered a year marked by disciplined execution and strategic investment. Our balance sheet remains robust and provides sufficient flexibility through price cycles and the step change in met coal production reshapes our competitive position. We have invested approximately $750 million of organic cash flow to develop and expand Centurion, an investment that significantly enhances our leverage to premium hard coking coal markets and provides a cornerstone asset for the next 25 years. As a result, Peabody enters 2026 from a position of strength with an enhanced met platform, rapidly improving PLV benchmark prices, continued strong cash flowing thermal operations and overall supportive market conditions. Together, these factors position the company exceptionally well for the year ahead.

31.     The above statements in Paragraphs 24 to 30 were false and/or materially misleading. Defendants created the false impression that they possessed reliable information pertaining to the Company's Centurion ramp-up and anticipated growth. In truth, Peabody Energy's overly optimistic March 2026 Centurion ramp-up date and promises regarding the Company's inflated guidance, fell short of reality when numerous issues at Centurion caused a significant delay to the mine's ramp-up and Peabody Energy's first quarter met segment volumes.

### The Truth Begins to Emerge

#### March 30, 2026

32.     On March 30, 2026, Defendants filed a "Regulation FD Disclosure" with the SEC lowering guidance relating to the Centurion mine's output for first quarter 2026 ahead of Peabody Energy's first quarter 2026 earnings release. The press release stated, in pertinent part:

Based on recent events, Peabody Energy Corporation (the "*Company*" or "*Peabody*") has determined that sales volume from the Centurion mine is expected to be below prior expectations for the first quarter of 2026. The mine is expected to deliver approximately 250,000 tons in the first quarter, based on greater-than-anticipated mine commissioning challenges.

Full-year 2026 metallurgical coal volume targets remain unchanged at 10.3-11.3 million tons.

The Company will report its full first quarter results on May 5, 2026.

33.     The aforementioned statements made by Individual Defendants were in direct contrast to statements made during the Class Period. As part of those earnings calls and investor presentations, Defendants continually touted that Centurion mine would be fully operational by March 2026 and continuously reaffirmed guidance, failing to make mention of complications and challenges that would prevent the mine from achieving fully operational status by the anticipated date.

34.     Investors and analysts reacted immediately to Peabody Energy's revelation. The price of Peabody Energy's common stock declined dramatically. From a closing market price of $39.50 per share on March 27, 2026, Peabody Energy's stock price fell to $35.68 per share on March 30, 2026, a decline of about 9.7% in the span of a single trading day.

35.     A number of well-known analysts who had been following Peabody Energy highlighted the initial disclosure, but emphasized that little was disclosed as to the breadth of the impact the aforementioned challenges would have on Centurion mine long-term. For example, Jefferies, while maintaining a Buy rating, summarized, in pertinent part:

> Peabody reported in an 8-K filing this morning that its Centurion mine will sell ~250kst of met coal in 1Q26, which is less than half of the initial guidance of ~700kst. The miss stems from "greater-than-expected mine commissioning challenges" at this important operation.

36.     Similarly, UBS published a report following Peabody Energy's disclosure titled, "Centurion ramp-up challenges now resolved," noting the lowered first quarter 2026 guidance, while highlighting, in relevant part:

> [N]o material geology/geotechnical issues have been observed and the company reiterate there is no ongoing of systemic issues/challenges. The longwall is now operating as expected. We reduce our estimates for 2026 considering impacts and

13

also take a slightly more conservative outlook at Centurion ahead of steady state delivery this year.

37.    The fact that these analysts, and others, discussed Peabody Energy's surprise slashed guidance suggests that the public placed significant weight on Peabody Energy's prior statements detailing a focus on and confidence in the Company's security offerings. The frequent, in-depth discussion of the ramp-up timeline miss and slashed guidance confirms that Defendants' statements during the Class Period were material.

38.    Notwithstanding Defendants' March 30, 2026 disclosures, they continued to mislead investors by omitting key details from their disclosure related to the breadth of challenges and full year 2026 guidance pertaining to Centurion mine's ramp-up timeline and expected output. In doing so, Defendants minimized the significance and scope of the challenges the Company was facing with Centurion and the impact these challenges would have on Peabody Energy's full year 2026.

### *The Truth Fully Emerges*

#### *May 5, 2026*

39.    On May 5, 2026, Defendants issued a press release reporting results for first quarter 2026. Defendant Grech stated, in pertinent part:

> Amid volatility in global energy markets, our thermal segments benefited from strong demand and higher realized pricing. While we have extended the Centurion commissioning period, due to temporary equipment and roof control challenges, we continue to advance toward full longwall production rates. Our first quarter results demonstrate the value of our diverse global platform and reflect the durability of coal's role in providing reliable and affordable power.

40.    During the same-day earnings call, Peabody Energy disclosed the Company's failure to meet its own goal of Centurion ramp-up by March 2026. Defendant Grech stated, in relevant part:

14

Focusing on our top priority, Centurion, I'll provide a thorough update of where we are today.

As you know, as part of our commissioning of equipment in February, we encountered temporary mechanical and electrical issues. While those challenges were resolved, the disruptions led to a slower cutting speed, which in turn contributed to roof control conditions. Maintaining roof integrity is critical to sustaining optimal cutting speeds. As a result, early in the ramp-up, progress was slower than we were anticipating even after resolution of the mechanical and electrical issues.

Importantly, once the mechanical and electrical issues were resolved, the team implemented a comprehensive response plan centered on proactive strata management and disciplined execution with safety as a top priority. We have brought together a highly experienced group of engineering and operational personnel from across the platform to address these challenges. Since that time, we have been systematically working through what was at its core an iterative cycle of slower equipment performance affecting roof conditions.

Over the past several weeks, we have taken deliberate steps to stabilize the operation by reinforcing the roof and face, realigning shields and improving overall cutting conditions. Naturally, every mine is unique with different geology, equipment and operating conditions, and it has taken some time to apply the right solutions at Centurion. While this has required a longer-than-anticipated commissioning period, it ensures that safety remains paramount as we work toward durable solutions.

Our safety performance has remained strong, and I want to be clear that we have had no carbon monoxide events, no methane issues, no ignition events and no regulatory challenges. While we are not yet at full cutting speed, the key remediation steps are largely in place, and we are encouraged by what we're seeing. We believe the remaining temporary headwinds are largely confined to the second quarter, with performance in the back half of 2026 expected to reflect a return to full longwall production rates.

We expect to sell roughly 300,000 tons in the second quarter, reflecting strong June production, but a traditional lag in converting production at the mine into sales at the port. Additionally, the 7-week longwall move that had been planned for the fourth quarter is now expected to shift into early 2027, which will support stronger production in the second half of this year. As a result, our full year sales outlook for Centurion is now 2.5 million tons compared to our original expectation of 3.5 million tons.

With that said, we've updated full year met segment volumes to reflect the 1 million ton decrease and increased cost to a range of $123 to $133 per ton. Stepping back,

15

Centurion remains one of the most attractive assets in our portfolio with a strong position on realized pricing, cost, structure and mine life.

41.     Also during the earnings call, Defendant Spurbeck stated, in pertinent part:

Realized export prices averaged $86.25 per ton, up more than 5% from the prior quarter, driven by higher Asian demand amid elevated LNG prices in the latter part of the quarter. Higher production from both Australian thermal mines helped reduce cost to $50.26 per ton, below the low end of guidance, resulting in a 25% adjusted EBITDA margin and $48.5 million of adjusted EBITDA. Seaborne metallurgical shipments totaled 2 million tons, 400,000 tons below plan due to the longwall ramp-up challenges at Centurion and unfavorably wet weather at the CMJV, partially offset by higher-than-anticipated production at Metropolitan, where we completed a longwall move ahead of schedule.

Costs were higher than our guidance at $142 per ton, largely due to lower volumes at Centurion, partially offset by realized prices that increased 13% quarter-over-quarter. The segment recorded an adjusted EBITDA loss of $7 million as an otherwise strong quarter was reduced by $80 million from the Centurion ramp-up, including $10 million of additional commissioning costs. Our U.S. thermal business delivered $61.5 million of adjusted EBITDA in the first quarter. The PRB shipped 21.2 million tons, exceeding expectations.

*     *     *

We expect seaborne metallurgical volume of 2.3 million tons with realizations of 75% of the premium hard coking coal index. Costs are expected to continue at higher than full year run rates due to lower production at Centurion before achieving full longwall volume in the second half of the year. In the PRB, we anticipate shipments of 19 million tons at cost of $13.25, reflecting the traditional second quarter shoulder season and the $0.50 adjustment to higher fuel costs. Other U.S. thermal coal shipments are expected to increase to 3.4 million tons with costs at $45 to $49 per ton, in line with full year guidance.

In closing, our first quarter results highlight the value of our diversified global assets. Strong performance from our thermal segments, both abroad and here in the United States, continues to generate substantial free cash flow. Peabody ended the quarter with just under $500 million in cash and total liquidity above $850 million. This financial position reflects the resilience of our balance sheet and provides financial flexibility to navigate near-term challenges, support our shareholder return program and continue to invest in long-term value creation.

42.     During the question-and-answer segment of the earnings call, Defendant Grech answered questions from analysts, in relevant part:

16

<Q: George Eadie – UBS Investment Bank – Analyst> Jim, your audio was muffling, I think, before, so sorry if this is a bit of a repeat. But what specifically at Centurion were the electrical and mechanical issues experienced? And were there any issues with the shields not bearing the roof weight properly due to roof conditions or undulations at all in the roof?

*    *    *

<A: James C. Grech> Okay. If you hear me catching my breath because I'm talking at the top of my voice. So what we've had is a longer-than-anticipated commissioning period at the mine. So to get to the situations you talked about, during the initial commissioning, we encountered some unanticipated electrical and mechanical issues that we hadn't picked up during -- we did testing, we did a mini build on the surface to test the equipment. But once we got the equipment underground, put it together and put it under full load conditions, we started having some issues with it.

So fundamentally, what happened with that is we had 8-year-old unused mining equipment. We put an updated technology in it and then we put it underground. And when I got under full load, we started having issues that we weren't anticipating electrically. And we had to troubleshoot that, order parts and repair. And once we got past the electrical issues, we had some mechanical issues with conveyors and shoots and so on.

What I would call standard commissioning issues that you have with this type of situation in a new mine and equipment that's been sitting on the shelves for a while, all taking much longer than we had anticipated. So with that situation going in the longwall sitting, and what happened was the longwall was advancing very slowly during this commissioning period. So the slow progress of the longwall gave rise to some localized ground conditions where the longwall was sitting, we had moisture accumulating in some roof cavities above that, combined with the softening of the floor beneath the shield. So the roof conditions have been addressed with void fill and under control where we have the longwall right now in its current position.

The floor conditions we've adjusted to, but what's happened is the -- with the floor conditions, we've got misalignment in a limited number of shields. And that really is where we are in the final stages of remediation that I had outlined to Nate is getting those shields in alignment. And the only way to do that is to advance the longwall, adjust the shields, advance the longwall, adjust the shields. And that's going to take us another week or 2 to do that. So we anticipate getting through that by the end of the month.

And as we -- each time we advance, we progressively improve with our remediation. And once we get a little further along here, we get on to some fresh

17

ground underneath those shields, we'll be going at forecasted rates. So George, did I answer the question you had asked there?

<Q: George Eadie> Yes.

<A: James C. Grech> I'm assuming you...

<Q: George Eadie> Exactly. Yes. No, that was great. Appreciate all that. And so are you guys like testing the shields to make sure they're carrying the roof load? Is that something you can do and are doing, I guess?

<A: James C. Grech> Yes. The shield themselves are performing well. It's just they're out of alignment, and we just have to get them straightened out between the floor and the roof. That's really what's going on here at the moment, George.

43.     Investors and analysts reacted immediately to Peabody Energy's revelation. The price of Peabody Energy's common stock declined dramatically. From a closing market price of $26.52 per share on May 4, 2026, Peabody Energy's stock price fell to $25.00 per share on May 5, 2025, a decline of 5.7%.

44.     A number of well-known analysts who had been following Peabody Energy lowered their price targets in response to Peabody Energy's disclosures. For example, on May 5, 2026, UBS decreased its price target for Peabody Energy to $30.50 from $32.00, citing Peabody Energy's Centurion revision and miss.

45.     Similarly, Jefferies reported on Peabody Energy's disappointing results and guidance, in relevant part:

Peabody reported significantly weaker-than-expected 1Q results due to previously disclosed issues at Centurion ($80m EBITDA impact) and higher-than expected- costs in the PRB. Guidance for 2Q is also weak as costs are expected to be materially higher in all segments.

46.     The fact that these analysts, and others, discussed Peabody Energy's timeline shortfall and the Company's surprise slash to its previously-issued guidance, suggests the public placed significant weight on Peabody Energy's prior statements and outlook. The frequent, in-

depth discussion of Peabody Energy's Centurion March 2026 ramp-up date, as well as the increased segment volumes that accompany the ramp-up, confirms that Defendants' statements during the Class Period were material. Furthermore, Peabody Energy's failure to fully account for the challenges at Centurion mine when decreasing first quarter 2026 guidance and, instead, reassuring investors that the challenges were temporary and resolved reaffirms that Defendants knew or deliberately disregarded the breadth of the issues at Centurion mine and the severe impact they were likely to cause well beyond first quarter 2026 fiscal results.

### *Additional Scienter Allegations*

47.     During the Class Period, Defendants acted with scienter in that they knew or otherwise were deliberately reckless in not knowing that the public statements disseminated on behalf of Peabody Energy were materially false and misleading at the time they were made. Defendants had actual knowledge of, or access to, non-public information concerning the anticipated timeline and ramp-up of Centurion mine as well as any related issues that would cause undue delays. Thereby, Defendants knowingly or recklessly disregarded that maintaining the longstanding timeline in the face of a multitude of significant issues was misleading.

48.     In fact, Defendants knew or deliberately disregarded that, despite touting the quality of the equipment and confidence in Centurion's ramp-up timeline, Peabody Energy would be unable to meet the March 2026 deadline. Defendants knew or deliberately disregarded these issues and continued to portray confidence, even mere weeks before the March 2026 date. Despite such knowledge, Defendants repeatedly touted the ramp-up timeline, even claiming to be ahead of schedule in early 2026.

49.     Moreover, Defendants knew or deliberately disregarded the breadth of the challenges at Centurion mine, claiming that these challenges would not have any impact on the

19

Company's results beyond first quarter 2026. In fact, when Defendants disclosed that the Company was lowering first quarter 2026 guidance related to Centurion mine mere weeks ahead of releasing earnings results, Peabody Energy failed to provide investors with the complete picture; thus, deliberately omitting key details related to the actual, ongoing issues at Centurion mine that Defendants knew or deliberately disregarded would have a negative impact lasting well beyond first quarter 2026.

### Loss Causation and Economic Loss

50.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Peabody Energy's common stock and operated as a fraud or deceit on Class Period purchasers of Peabody Energy's common stock by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Peabody Energy's common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Peabody Energy's common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

51.     Peabody Energy's stock price fell in response to the partial corrective event on March 30, 2026, as alleged *supra*. On March 30, 2026, Defendants disclosed information that was directly related to their prior misrepresentations and material omissions concerning Peabody Energy's guidance pertaining to Centurion mine. In particular, on March 30, 2026, Peabody Energy announced it was slashing first quarter 2026 guidance related to Centurion mine's output due, providing minimal detail regarding the challenges Centurion mine was experiencing.

52.     Peabody Energy's stock price fell again in response to the corrective event on May 5, 2026, as alleged *supra*. On May 5, 2026, Defendants disclosed information that was directly related to their prior misrepresentations and material omissions concerning Peabody Energy's Centurion mine ramp-up and associated increased met segment volumes. In particular, on May 5, 2026, Peabody Energy withdrew its previously issued guidance citing issues with Centurion's ramp-up, despite years of reassurance that the mine was set to be in full longwall production by March 2026.

### *Presumption of Reliance; Fraud-On-The-Market*

53.     At all relevant times, the market for Peabody Energy's common stock was an efficient market for the following reasons, among others:

(a)     Peabody Energy's common stock met the requirements for listing and was listed and actively traded on the NYSE during the Class Period, a highly efficient and automated market;

(b)     Peabody Energy communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)     Peabody Energy was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)     Unexpected material news about Peabody Energy was reflected in and incorporated into the Company's stock price during the Class Period.

21

54.     As a result of the foregoing, the market for Peabody Energy's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Peabody Energy's stock price. Under these circumstances, all purchasers of Peabody Energy's common stock during the Class Period suffered similar injury through their purchase of Peabody Energy's common stock at artificially inflated prices, and a presumption of reliance applies.

55.     Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

### *No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine*

56.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with ramp-up projections while at the same time failing to maintain adequate forecasting processes. Defendants provided the public with forecasts that failed to account for the challenges at Centurion and/or adequately disclose the fact that the Company at the current time did not have adequate forecasting processes pertaining to segment production.

57.     To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that

22

could cause actual results to differ materially from those in the purportedly forward-looking statements.

58.     Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Peabody Energy who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

59.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Peabody Energy's common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

60.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Peabody Energy's common stock were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and

can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Peabody Energy or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of May 1, 2026, there were 121.8 million shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

61.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

62.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

63.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Peabody Energy;

(c)       whether the Individual Defendants caused Peabody Energy to issue false and misleading financial statements during the Class Period;

(d)       whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)       whether the prices of Peabody Energy's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)       whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

64.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

<u>**COUNT I**</u>

*Against All Defendants for Violations of*

<u>*Section 10(b) and Rule 10b-5 Promulgated Thereunder*</u>

65.      Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

66.      This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

67.      During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiff and the other

members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Peabody Energy common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Peabody Energy's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

68.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Peabody Energy's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

69.     By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew

26

or recklessly disregarded that material facts were being misrepresented or omitted as described above.

70.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of Peabody Energy's internal affairs.

71.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Peabody Energy's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Peabody Energy's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Peabody Energy's common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

72.     During the Class Period, Peabody Energy's common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares

27

of Peabody Energy's common stock at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Peabody Energy's common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Peabody Energy's common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

73. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

74. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### *Against the Individual Defendants*

### *for Violations of Section 20(a) of the Exchange Act*

75. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

76. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the

28

conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Peabody Energy's misstatements.

77.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Peabody Energy which had become materially false or misleading.

78.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Peabody Energy disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Peabody Energy to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Peabody Energy's common stock.

79.     Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause Peabody Energy to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

80.     By reason of the above conduct, the Individual Defendants and/or Peabody Energy are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demand judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

*[Signature blocks on following page]*

Dated: June 23, 2026

Respectfully submitted,

**WEHRLE LAW LLC**

*/s/ J. Christopher Wehrle*
James Christopher Wehrle, #45592MO
2601 S. Hanley Rd.
St. Louis, Missouri 63144
(314) 272-4113
(314) 272-4107 Facsimile
chris@wehrlelaw.com

*Liaison Counsel for Plaintiff*

-and-

**LEVI & KORSINSKY, LLP**
Adam M. Apton
(*pro hac vice* forthcoming)
33 Whitehall Street, 27th Floor
New York, New York 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Attorneys for Plaintiff*

31